UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| In re:<br><br>    FRANKLIN INDUSTRIAL COMPLEX, INC.,<br><br>                    Debtor. | Case No. 01-67459<br>Chapter 11 Case |

_____

| | |
|---|---|
| In re:<br><br>    CHRISTINE FALLS OF NEW YORK, INC.,<br><br>                    Debtor. | Case No. 01-67458<br>Chapter 11 Case |

_____

| | |
|---|---|
| In re:<br><br>    TRAFALGAR POWER, INC.,<br><br>                    Debtor. | Main Case No. 01-67457<br>Chapter 11 Case<br><br>Jointly Administered |

_____

| | |
|---|---|
| MARINA DEVELOPMENT, INC., TRAFALGAR POWER,<br>INC., CHRISTINE FALLS OF NEW YORK, INC., FRANKLIN<br>INDUSTRIAL COMPLEX, INC., and PINE RUN OF VIRGINIA,<br>INC.,<br><br>                    Plaintiffs,<br><br><br>           vs.<br><br><br>ALGONQUIN POWER CORPORATION, INC., ALGONQUIN<br>POWER SYSTEMS, INC., ALGONQUIN POWER FUND<br>(CANADA), INC., ALGONQUIN POWER INCOME FUND,<br>ALGONQUIN POWER SYSTEMS NEW HAMPSHIRE, INC.,<br>ALGONQUIN POWER (U.S. HOLDINGS), INC., AETNA<br>LIFE INSURANCE COMPANY, CIT CREDIT GROUP, INC.<br>f/k/a NEWCOURT CREDIT GROUP, INC. and CANADIAN<br>INCOME PARTNERS 1 LIMITED PARTNERSHIP,<br><br>                    Defendants. | Adv. Pro. No.: 02-80005 |

_____

| | |
|---|---|
| MARINA DEVELOPMENT, INC., TRAFALGAR POWER,<br>INC., CHRISTINE FALLS OF NEW YORK, INC., FRANKLIN<br>INDUSTRIAL COMPLEX, INC., and PINE RUN OF<br>VIRGINIA, INC.,<br><br>                    Plaintiffs,<br><br><br>            vs.<br><br><br>ALGONQUIN POWER CORPORATION, INC., ALGONQUIN | Adv. Pro. No.: 02-80008 |

POWER SYSTEMS, INC., ALGONQUIN POWER FUND
(CANADA), INC., ALGONQUIN POWER INCOME FUND,
ALGONQUIN POWER SYSTEMS NEW HAMPSHIRE, INC.,
ALGONQUIN POWER (U.S. HOLDINGS), INC., AETNA
LIFE INSURANCE COMPANY, CIT CREDIT GROUP, INC.
f/k/a NEWCOURT CREDIT GROUP, INC. and CANADIAN
INCOME PARTNERS 1 LIMITED PARTNERSHIP,

                                    Defendants.

_____

APPEARANCES:

HARRIS BEACH PLLC                          WENDY A. KINSELLA, ESQ.
*Attorneys for Debtors*                    DAVID M. CAPRIOTTI, ESQ.
333 West Washington Street, Suite 200
Syracuse, New York 13202

BOUSQUET HOLSTEIN PLLC                     ROBERT K. WEILER, ESQ.
*Attorneys for Marina Development, Inc.*
One Lincoln Center, Suite 900
110 West Fayette Street
Syracuse, New York 13202

MENTER, RUDIN & TRIVELPIECE, P.C.          JEFFREY A. DOVE, ESQ.
*Attorneys for the Algonquin Entities*
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1498

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

This Memorandum-Decision and Order results from the undersigned's first foray into

sixteen-year-old litigation beginning in 1999 between the parties and unrelated third parties

involving several consolidated actions spanning multiple forums.  The complex history of this epic

battle between the parties has been painstakingly documented in prior decisions of this Court

issued by the undersigned's predecessor[1] and in prior decisions issued by the United States District

---

[1] The Honorable Stephen D. Gerling retired from the Bench as Chief Bankruptcy Judge for the United States
Bankruptcy Court for the Northern District of New York on February 28, 2009, following which time the undersigned
assumed responsibility for the above-captioned cases and adversary proceedings.

Court for the Northern District of New York (the "District Court") and the Second Circuit Court of Appeals (the "Second Circuit"). *See Algonquin Power Income Fund, Inc. v. Christine Falls of New York, Inc.*, No. 6:07-CV-1258, 2013 U.S. Dist. LEXIS 89341 (N.D.N.Y. June 26, 2013); *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, No. 5:99-CV-1238, 2012 U.S. Dist. LEXIS 46945 (N.D.N.Y. Apr. 3, 2012), *aff'd sub nom. Trafalgar Power, Inc. v. Algonquin Power Corp.*, 515 F. App'x 57 (2d Cir. 2013); *Algonquin Power Income Fund, Inc. v. Christine Falls of New York, Inc.*, No. 6:09-CV-226, 2009 U.S. Dist. LEXIS 115854 (N.D.N.Y. Dec. 10, 2009); *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 396 B.R. 584 (N.D.N.Y. 2008), *aff'd in part, vacated & remanded in part sub nom Christine Falls Corp. v. Algonquin Power Fund, Inc.*, 401 F. App'x 584 (2d Cir. 2010); *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 427 F. Supp. 2d 202 (N.D.N.Y. 2006), *aff'd in part, vacated & remanded in part sub nom Christine Falls Corp. v. Algonquin Power Fund, Inc.*, 401 F. App'x 584; *Christine Falls of New York, Inc. v. Algonquin Power Corp., Inc. (In re Franklin Indus. Complex, Inc.)*, 377 B.R. 32 (Bankr. N.D.N.Y. 2007), *aff'd*, 396 B.R. 106, *vacated and remanded*, 362 F. App'x 151 (2d Cir. 2010), *aff'd*, 466 B.R. 175 (N.D.N.Y. 2011), *rev'd and remanded*, 509 F. App'x 82 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 684 (2013); *Trafalgar Power, Inc. v. Algonquin Power Corp., Inc.*, Ch. 11 Case No. 01-67451, Adv. No. 02-80005, slip. op. (Bankr. N.D.N.Y. June 20, 2003), Report and Recommendation adopted by Order (N.D.N.Y. Oct. 24, 2003). Since the undersigned inherited this case in 2009, the litigation has been the subject of multiple decisions and appeals and has generated millions of dollars in attorneys' fees. After years of extensive, protracted litigation in the higher courts that required bankruptcy matters to be held in abeyance until the conclusion of such litigation, Trafalgar Power, Inc. ("Trafalgar Power"), Christine Falls of New York, Inc. ("Christine Falls") (collectively, "Trafalgar" or "Debtors"), and

Marina Development, Inc. ("Marina")[2, 3] and the Algonquin entities comprised of Algonquin

Power Corporation, Inc. ("APC"), Algonquin Power Systems, Inc. ("APS"), Algonquin Power

Fund (Canada), Inc. ("APF"), Algonquin Power Income Fund ("APIF"),[4] Algonquin Power

Systems New Hampshire, Inc. ("APSNH"), and Algonquin Power (U.S.) Holdings, Inc. ("APH")

(collectively, "Algonquin") now employ the procedural weapon of summary judgment in their

respective attempts to ultimately dispense with Algonquin's bankruptcy claims in Debtors' jointly

administered bankruptcy cases and Debtors' and Marina's remaining causes of action against

Algonquin in their adversary proceedings before this Court.[5]

Specifically, Debtors seek partial summary judgment pursuant to Federal Rule of Civil

Procedure ("Civil Rule") 56, as incorporated into Federal Rule of Bankruptcy Procedure

("Bankruptcy Rule") 7056 and applied to contested matters by Bankruptcy Rule 9014(c), granting

in part their Objection to the Allowance of Certain Claims Pursuant to 11 U.S.C. § 502 and Civil

Rule 3007 filed on January 20, 2009 (the "Claim Objection," ECF No. 546), wherein Debtors seek

---

[2] Marina is the parent company and owner of Debtors, Franklin Industrial Complex, Inc. ("Franklin"), and Pine Run of Virginia, Inc. ("Pine Run"). Marina was owned by Arthur Steckler ("Steckler") until 1999 or thereabouts. Steckler continues to retain control over Marina to date.

[3] The Second Circuit and District Court predominantly refer to Trafalgar Power and Christine Falls collectively as "Trafalgar," but they occasionally use the same short-form reference to refer collectively to Trafalgar Power, Christine Falls, and Marina. For consistency's sake, the Court adopts the predominant short-form reference utilized by the higher courts when referring to Trafalgar Power and Christine Falls in the non-bankruptcy context and, when including Marina, will refer to both Trafalgar and Marina. The Court also notes that the District Court refers at times to Trafalgar Power individually as "TPI."

[4] APIF changed its name to Algonquin Power Company during the course of Debtors' bankruptcy cases and these proceedings. In order to remain consistent with the record, the parties and the Court continue to refer to APIF rather than Algonquin Power Company.

[5] Documents filed in Trafalgar Power's bankruptcy case, designated as Debtors' main lead case, will be referred to herein as "ECF No. __." Documents filed in Debtors' and Marina's adversary proceedings will be referred to herein as "ECF Adv. No. __." Although assigned a separate adversary proceeding number as captioned above, identical pleadings and documents filed in Marina's adversary proceeding will not be separately referenced. The Court notes that Marina's bankruptcy case was severed and dismissed in 2005 and subsequently closed. Marina's adversary proceeding, however, remains pending. *See Porges v. Gruntal & Co. (In re Porges)*, 44 F.3d 159, 162 (2d Cir. 1995) ("[T]he dismissal of an underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding which was related to the bankruptcy case at the time of its commencement. The decision whether to retain jurisdiction should be left to the sound discretion of the bankruptcy court or the district court, depending on where the adversary proceeding is pending.").

assorted relief including, but not limited to, recoupment against Claim Numbers 5 and 7 filed by

APIF in the Trafalgar Power bankruptcy case and the Christine Falls bankruptcy case, respectively,

in the principal amount of $18,821,496.00, plus interest, costs, expenses, and attorneys' fees (the

"Algonquin Claims").[6]    Algonquin seeks summary judgment pursuant to Civil Rule 56, as

incorporated into Bankruptcy Rule 7056, dismissing Debtors' and Marina's remaining causes of

action against it in their adversary proceedings to recover allegedly fraudulent transfers pursuant

to " §§ 544 and 548 and to equitably subordinate the Algonquin Claims pursuant to § 510(c)(1) as

set forth in their initial Adversary Complaints filed on August 29, 2001 (the "Adversary

Complaint," ECF Adv. No. 1).

      The summary judgment record is voluminous and includes the following, together with

countless exhibits: Debtors' Claim Objection and separately documented exhibits (ECF Nos. 546,

548, 550, 551, and 552); Algonquin's Response to the Claim Objection filed on February 19, 2009

(ECF No. 564); Marina's joinder in the Claim Objection filed on February 19, 2009 (ECF No.

565); Debtors' Memorandum in Further Support of the Claim Objection filed on February 23,

2009 (ECF No. 567); Debtors' Supplemental Objection filed on September 14, 2009 (ECF No.

629); Debtors' Joint Motion for Partial Summary Judgment on the Claim Objection and Statement

of Undisputed Material Facts filed on September 5, 2013, ("Debtors' Partial Summary Judgment

Motion," ECF No. 1082); Debtors' Affirmation in Support of their Partial Summary Judgment

Motion filed on the same date (ECF No. 1083); Debtors' Memorandum of Law in Support of their

Partial Summary Judgment Motion filed on the same date (ECF No. 1084); Marina's Response

and Joinder in Debtors' Partial Summary Judgment Motion filed on behalf of itself and Ridgewood

---

[6] Debtors' bankruptcy cases were filed prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), Pub. L. No. 109-8, which took effect on October 17, 2005.  Accordingly, all statutory references herein are to the pre-BAPCPA United States Bankruptcy Code (the "Bankruptcy Code"), 11 U.S.C. § 101, *et seq.*, unless otherwise indicated.

Heights, Inc., Stever Properties, LLC, and Trafalgar Properties, LLC on September 18, 2013 (ECF No. 1096); Algonquin's Affirmation, Response, and Memorandum of Law in Opposition to Debtors' Partial Summary Judgment Motion filed on September 19, 2013 (ECF Nos. 1106, 1107, and 1108, respectively); Debtors' Preliminary Reply Memorandum and Declaration of Kelly C. Griffith, Esq. in Further Support of their Partial Summary Judgment Motion (the "Griffith Declaration") filed on September 27, 2013 (ECF Nos. 1115 and 1116, respectively); Algonquin's Supplemental Memorandum of Law in Opposition to Debtors' Partial Summary Judgment Motion filed on October 18, 2013 (ECF No. 1133); the pleadings in Debtors' and Marina's adversary proceedings; Algonquin's Motion for Summary Judgment filed on September 5, 2013 (ECF Adv. No. 127); Algonquin's Statement of Material Facts not in Dispute (Ex. G to Algonquin's Motion for Summary Judgment, ECF Adv. No. 127); Debtors' and Marina's Joint Memorandum in Opposition to Algonquin's Motion for Summary Judgment filed on September 19, 2013 (ECF Adv. No. 131); Debtors and Marina's Supplemental Memorandum of Law in Further Support of Debtors' Partial Summary Judgment Motion and in Opposition to Algonquin's Motion for Summary Judgment filed on October 18, 2013 (ECF No. 1134; ECF Adv. No. 136); Algonquin's Supplemental Memorandum of Law in Support of its Motion for Summary Judgment filed on October 18, 2013 (ECF Adv. No. 135); Debtors' letter brief filed on October 23, 2013 (ECF Adv. No. 137); and Marina's letter of joinder to Debtors' letter brief filed on October 24, 2013 (ECF Adv. No. 139) (collectively, the "Summary Judgment Record"). Based upon and after full consideration of the Summary Judgment Record, the parties' decisional history rendered by the higher courts, authorities submitted by the parties, and oral argument heard on October 1, 2013,

the Court now makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7056.[7]

## JURISDICTION

The Court has jurisdiction over the parties and subject matter of this contested matter and adversary proceedings pursuant to 28 U.S.C. §§ 1334(a)–(b), 157(a)–(b)(2), (b)(2)(B), (H), and (O).  Algonquin argues, however, even at this late hour that the Court lacks final adjudicative authority with respect to the Claim Objection.  (Algonquin's Mem. of Law in Opp'n to Mot. for Partial Summ. J. on Debtors' Claims Obj. 6–7, 14–17.)  Algonquin's jurisdictional challenge is thoroughly explained within its cited memorandum of law, and is now summarily rejected by the Court.

On February 12, 2009, Algonquin filed a motion requesting that the District Court withdraw the reference of the Claim Objection (the "Motion to Withdraw the Reference Regarding the Claim Objection," ECF No. 563), which Debtors and Marina separately opposed (ECF Nos. 573 and 575, respectively).  By Memorandum-Decision and Order dated December 10, 2009, the Honorable David N. Hurd, United States District Judge, denied Algonquin's Motion to Withdraw the Reference Regarding the Claim Objection for the reason that the "theories upon which the objection is based are more appropriate for resolution by the Bankruptcy Court, such as . . . determination of whether the loans are non-recourse and subject to setoff, recoupment, or equitable subordination . . . ."  (Ex. D to the Griffith Declaration.)   Judge Hurd also rejected Algonquin's

---

[7] Significant activity ensued in Debtors' bankruptcy cases after the Court took Debtors' Partial Summary Judgment Motion and Algonquin's Motion for Summary Judgment under advisement following oral argument in the fall of 2013.  Notably, on or about July 9, 2014, Algonquin agreed to and Trafalgar successfully pursued a § 363(b) sale of substantially all of Trafalgar's assets.  During the course of the multi-stage § 363(b) sale process, on November 18, 2014, at the parties' request, the Court entered an Order Directing the Parties to Mediation (ECF No. 1403), and an Order appointing the Honorable Margaret Cangilos-Ruiz as the mediator on the same date (ECF No. 1404).  By letter dated December 8, 2014, Chief Judge Cangilos-Ruiz, in her role as mediator, advised the Court that the parties were unable to reach a settlement through mediation (ECF No. 1428), thereby terminating mediation and returning the matters under advisement to the Court for adjudication.

argument that the District Court was best positioned to determine whether its decisions had preclusive effect upon matters determinative to the Claim Objection.[8]  Algonquin's arguments in its renewed jurisdictional challenge closely mirror those made to the District Court.  Where the District Court has rendered a decision denying a request to withdraw the reference pursuant to 28 U.S.C. § 157(d), it is not appropriate for this Court to second guess that decision.

## BACKGROUND

The underlying facts of this case are fully set forth and often repeated in the above-cited prior decisions and orders.  Because the parties' motions are predicated on the application of these facts to certain legal doctrines, however, the Court cannot avoid yet another recitation of the facts and procedural history so undoubtedly familiar to the parties.  The following factual recitation is borrowed largely from the decisions issued by Judge Hurd, who has presided over litigation involving the parties for the past sixteen years.[9]

*I.*      *Pre-Bankruptcy Events and the Parties' Pre-Bankruptcy Relationship*

Between 1986 and 1988, Trafalgar acquired and developed seven hydroelectric power projects in New York (the "New York Projects") and Franklin acquired and developed two hydroelectric power projects in New Hampshire (the "New Hampshire Projects") (collectively, the

---

[8] Algonquin argued in its Motion to Withdraw the Reference Regarding the Claim Objection that because Debtors' primary basis for the Claim Objection was the res judicata effect of District Court litigation commenced by Trafalgar and Marina against Algonquin and unrelated third-parties regarding non-core matters, the characterization of the Claim Objection as a core matter, which Algonquin did not dispute, did not militate against withdrawal of the reference.  At that point in the District Court litigation, Trafalgar and Marina had obtained dismissal of Algonquin's counterclaims.  As explained in greater detail below, following a reversal of fortunes handed down by the Second Circuit in the District Court litigation, *see* Discussion *infra* pp. 21–22,  the parties' have reversed their positions with respect to the application of res judicata.  Notably, before this Court, Algonquin now argues in favor of res judicata while Debtors and Marina fervently argue against its application to keep Debtors' recoupment defense in support of the Claim Objection and Debtors' and Marina's remaining causes of action against Algonquin in the adversary proceedings alive.

[9] Given the enormity of the record and the tangled web of multi-jurisdictional litigation that the parties have created, the record does contain factual inconsistencies but they are minor and immaterial to the Court's adjudication of the parties' motions.  The Court has been able to reconcile slightly disparate factual findings in order to provide an accurate overview of the factual and procedural history as set forth herein.

"Power Projects").  In the late 1980s, Trafalgar obtained a $22.5 million loan from Aetna Life

Insurance Company ("Aetna") to finance the development and operation of the New York Projects

(the "Aetna Loan").  Aetna also provided Trafalgar with an unsecured line of credit in the amount

of $1.3 million.  Trafalgar pledged substantially all of its assets, including the New York Projects,

as collateral for the Aetna Loan.

Construction and development of the Power Projects resulted in financial disaster.  *Hydro

Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 12 (2d Cir. 2000).  In 1989, Trafalgar

commenced a lawsuit against the engineering firm that designed the New York Projects, alleging

engineering malpractice regarding the design of the New York Projects as it was related to

projected power generation potential and, concomitantly, income potential.  This lawsuit was

successful and Trafalgar obtained a judgment in the amount of $7.6 million (the "Malpractice

Judgment"), *see Hydro Investors v. Trafalgar Power, Inc.*, 63 F. Supp. 2d 225 (N.D.N.Y. 1999)

(denying post-trial motions), *aff'd in part, vacated and remanded in part*, 227 F.3d 8 (vacating

denial of prejudgment interest and remanding for calculation of such interest), which it later

assigned to Pine Run in 1999, *see* 427 F. Supp. 2d at 208.  As discussed in greater detail below,

this assignment became the subject of future litigation between Trafalgar and Algonquin.  *See*

Discussion *infra* pp. 14–15.

In 1991, Franklin obtained a $6.2 million loan from Confederation Leasing Limited

("Confederation") (the "Franklin Loan").  In connection with the same, Franklin pledged its assets

and Marina pledged its capital stock as collateral for the Franklin Loan.  Upon Confederation's

insolvency, Newcourt Credit Group, Inc. ("Newcourt") and Canadian Income Partners Limited

Partnership ("CIP") obtained and asserted rights as successors of Confederation and holders and

assignees of the Franklin Loan.  During 1994, Franklin experienced financial difficulties and defaulted on the Franklin Loan.  At some point thereafter, Algonquin acquired the Franklin Loan.

Trafalgar also incurred severe financial difficulties in the early to mid-1990s and defaulted on the Aetna Loan.  Aetna notified Trafalgar of the default and its intent to accelerate the entire balance due, which constituted more than $32,699,659.50 in principal and accrued interest, and to foreclose on the collateral.  Negotiations took place between Trafalgar and Aetna, which led to a restructuring of the debt.  As a precondition to the debt restructuring, Aetna required Trafalgar to hire a professional hydroelectric plant operator as manager for the New York Projects on a day-to-day basis.  To that end, Trafalgar hired Algonquin and they entered into a letter agreement on June 9, 1995.  Trafalgar and Algonquin thereafter entered into a second letter agreement on June 14, 1995 (the "1995 Letter Agreement"), wherein Algonquin agreed "not to enter into arrangements with Aetna in respect of financing the Trafalgar projects without the approval of Trafalgar."  (Ex. 3 to Debtors' Statement of Undisputed Facts.)  In June 1995, Algonquin and Franklin also executed a letter agreement pursuant to which Algonquin would assume management and operational responsibility for the New Hampshire Projects.  Algonquin began managing the Power Projects in June 1995.  Trafalgar and Algonquin subsequently entered into a Management Agreement on January 15, 1996 (the "Management Agreement"), whereby Algonquin agreed to provide various operations, maintenance, and management services to Trafalgar for the New York Projects.  All of the income generated from the Power Projects was deposited in an operational account with State Street Bank, the named Security Trustee ("State Street" or "Security Trustee").  Under the Management Agreement, Algonquin made draw requests for its management fee and otherwise directed State Street to disburse funds from the account to continue operations of the Power Projects.

In January 1996, pursuant to a Revised Loan Agreement, the original Aetna Loan was cancelled, the interest owed was forgiven, and the original amount of the New York Projects' debt was broken down into new A and B Notes that Aetna purchased for $22.5 million (the "Restructured Aetna Loan"). As part of the Restructured Aetna Loan, Algonquin agreed to loan Trafalgar funds in the form of working capital through the $1.3 million line of credit provided by Aetna. Also as part of the debt restructuring, State Street was to continue in its role as Security Trustee for the Aetna Loan, including the income generated by the New York Projects, which State Street had done since the inception of the Aetna Loan. Various documents were executed by the parties during the course of the restructuring on January 15, 1996, including the Revised Loan Agreement, Amended and Restated Collateral Trust Indenture (the "Indenture Agreement"), and an Extension and Modification Agreement (the "Modification Agreement") (collectively, the "Loan Documents"). Trafalgar pledged all rights and properties as collateral and all of its stock as security for the Restructured Aetna Loan as evidenced by certain Stock Pledge Agreements.

The Loan Documents included a right of first refusal on behalf of Trafalgar in the event Algonquin sought to purchase the A or B Notes. The Loan Documents stated in part that if Algonquin made an offer to purchase the A Note, set to mature on February 10, 2003, or the B Note, set to mature on December 31, 2010, Trafalgar would have the right to purchase such Note at 105% of the offered purchase price and in accordance with any terms set forth in Algonquin's letter offer. In November 1996, Aetna notified Trafalgar that Algonquin had offered to purchase the B Note for $94,000.00. Shortly thereafter, Trafalgar notified Aetna of its intent to exercise its right of first refusal via a letter from Steckler in his capacity as Trafalgar's sole shareholder. Trafalgar's counsel then formally notified Aetna by letter that Trafalgar was exercising its right of first refusal, as evidenced by an enclosed $50,000.00 deposit, wherein counsel noted that the

balance of the purchase price would be paid by February 11, 1997. That date passed without the transaction taking place. On February 12, 1997, Aetna's counsel advised Trafalgar that its right of first refusal had expired when it failed to complete the transaction within the given timeframe. Aetna thereafter sold the A and B Notes to Algonquin. The A Note was paid in full and the B Note was ultimately assigned to APIF.

The Indenture Agreement defined an "Event of Default" as when Trafalgar failed to comply with any provision of the Loan Documents and the failure continued for more than ten days after any executive became aware of the failure. Trafalgar defaulted on its obligations by, *inter alia*, failing to keep the properties free from liens by paying their tax obligations when due. Specifically, Trafalgar failed to pay federal income taxes for the 1996 and 1997 tax years. The Internal Revenue Service ("IRS") unsuccessfully tried to collect the overdue taxes and penalties from Trafalgar. On July 1, 1999, the IRS issued a Notice of Intent to Levy on the Power Projects. Algonquin notified Trafalgar that it was in default under the Indenture Agreement due to its failure to pay corporate income taxes and demanded that Trafalgar cure the default by August 2, 1999. Trafalgar did not do so. On August 5, 1999, Algonquin notified Trafalgar that it was accelerating the B Note as permitted under the terms of the Loan Documents. On or about August 20, 1999, Algonquin directed State Street to pay the IRS and to take possession of all funds on deposit and remit those funds to Algonquin.

In response, on August 9, 1999, Trafalgar and Marina commenced an action in the District Court against Aetna and Algonquin wherein they challenged the legality of Aetna's sales of the A and B Notes to Algonquin and sought damages in excess of $20 million (the "First District Court Action"). On January 11, 2000, Trafalgar and Marina filed a multi-count amended complaint alleging the following claims: (1) breach of contract against Aetna with regard to Aetna's refusal

to transfer possession of the B Note to Trafalgar and failure to give Trafalgar the required notice and opportunity to exercise the right of first refusal with regard to the A Note; (2) breach of duty of good faith and fair dealing against Aetna with regard to Aetna's refusal to transfer possession of the B Note to Trafalgar and failure to give Trafalgar the required notice and opportunity to exercise the right of first refusal with regard to the A Note; (3) specific performance to require Aetna and Algonquin to transfer the A and B Notes to Trafalgar; (4) breach of fiduciary duty against Aetna for having conspired with Algonquin to refuse Trafalgar's exercise of the right to purchase the B Note and refusal to offer Trafalgar the right to purchase the A Note; (5) tortious interference with contract against Algonquin; (6) conversion of the B Note belonging to Trafalgar by Algonquin; and (7) breach of fiduciary duty by Algonquin, as manager of the New York Projects, with regard to Algonquin's conversion of Trafalgar's assets and use of those assets to purchase the B Note.  Algonquin counterclaimed for a declaratory judgment that it had the right to hold the A and B Notes and that Trafalgar had defaulted under the B Note, for judgment on the amount due under the B Note, and for its expenses to enforce the Stock Pledge Agreements.

Also in 1999, Franklin commenced an action in the New Hampshire Superior Court (the "New Hampshire State Court"), wherein Franklin asserted claims against Algonquin for mismanagement, breach of fiduciary duty, and conversion in connection with the New Hampshire Projects and Algonquin's purchase of the Franklin Loan from Newcourt and CIP (the "New Hampshire Action").  Franklin alleged in the New Hampshire Action that Algonquin had intentionally suppressed the power output at the New Hampshire Projects and/or failed to repair the facilities, resulting in a decrease in anticipated revenues, and that it had improperly purchased the Franklin Loan from Newcourt and CIP.  Algonquin filed certain counterclaims in the New Hampshire Action.

On August 15, 2000, Algonquin, on the basis of its claimed security interest in the Malpractice Judgment, commenced an action in the District Court against Trafalgar, Marina, and Pine Run related to Trafalgar's assignment of the Malpractice Judgment to Pine Run (the "Second District Court Action"). By order dated November 8, 2000, the District Court consolidated the First and Second District Court Actions (collectively, "the Consolidated District Court Actions"). In Algonquin's amended complaint, it asserted six causes of action: (1) conversion of the Malpractice Judgment, which Algonquin alleged was collateral that it was entitled to apply toward Trafalgar's outstanding debt; (2) constructive fraud pursuant to New York Debtor and Creditor Law § 273, based upon Trafalgar's conveyance of the Malpractice Judgment to Pine Run allegedly for less than fair consideration; (3) conveyance of the Malpractice Judgment with the intent to hinder, delay, or defraud Algonquin in violation of New York Debtor and Creditor Law § 276; (4) intentional fraud in conveying the Malpractice Judgment while knowing Trafalgar was unable to pay its debts also in violation of New York Debtor and Creditor Law § 276; (5) declaring that Algonquin was entitled to possession of the Malpractice Judgment as collateral to apply toward Trafalgar's outstanding debt; and (6) for attorneys' fees pursuant to New York Debtor and Creditor Law § 276-a. In the Second District Court Action, Algonquin sought reassignment of the Malpractice Judgment or an award of the proceeds of the Malpractice Judgment to Algonquin, to set aside the conveyance of the Malpractice Judgment, possession of the Malpractice Judgment, and attorneys' fees and costs.

On February 2, 2001, a Stipulation and Order was entered providing that the proceeds of the Malpractice Judgment be placed in escrow, and that no funds from the escrow be released except upon court order. A further order was entered on February 14, 2001, preliminarily enjoining Trafalgar from assigning or otherwise disbursing proceeds of the Malpractice Judgment and

requiring Algonquin to post a bond, which it timely did.  In late 2001 or early 2002, following several Steckler controlled entities' bankruptcy filings for chapter 11 protection in the Eastern District of North Carolina, a subsequent order was entered by the District Court directing the release and transfer of the escrowed Malpractice Judgment funds to an escrow account now maintained under this Court's jurisdiction.  The funds remain in escrow pending final resolution of the matters *sub judice.*

II.    *The Bankruptcy and Adversary Proceeding Filings*

Debtors, Marina, Franklin, and Pine Run filed their voluntary petitions pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of North Carolina on August 27, 2001.  The New Hampshire Action and Second District Court Litigation were stayed as a result of the same.  On August 29, 2001, Debtors and Marina commenced the instant adversary proceedings against Algonquin, Aetna, CIT, Newcourt, and CIP by filing the fifty-six page Adversary Complaint wherein they acknowledged that the "[m]atters detailed in this adversary proceeding are the subject of pending actions among the parties . . ." in both the District Court and the New Hampshire State Court.

The Adversary Complaint contained the following nineteen claims for relief: the First Cause of Action against Algonquin to avoid and recover fraudulent transfers pursuant to §§ 548 and 550 ("Claim 1"); the Second Cause of Action against Algonquin to avoid and recover fraudulent transfers pursuant to § 547 ("Claim 2"); the Third Cause of Action against Algonquin pursuant to § 542(e) to compel turnover and accounting ("Claim 3"); the Fourth Cause of Action against Algonquin pursuant to § 510(c) for equitable subordination ("Claim 4"); the Fifth Cause of Action against Algonquin pursuant to §§ 105 and 541 to impose a constructive trust ("Claim 5"); the Sixth Cause of Action against Algonquin to avoid transfers of property pursuant to §§ 544

and 550 ("Claim 6"); the Seventh Cause of Action against Aetna for breach of contract ("Claim

7"); the Eighth Cause of Action against Aetna for breach of duty of good faith and fair dealings

("Claim 8"); the Ninth Cause of Action against Aetna for breach of fiduciary duty ("Claim 9");

the Tenth Cause of Action against Aetna for conversion ("Claim 10"); the Eleventh Cause of

Action against Aetna and Algonquin for specific performance ("Claim 11"); the Twelfth Cause of

Action against Algonquin for conversion ("Claim 12"); the Thirteenth Cause of Action against

Algonquin for tortious interference with contract ("Claim 13"); the Fourteenth Cause of Action

against Algonquin for breach of fiduciary duty ("Claim 14"); the Fifteenth Cause of Action against

Algonquin for negligence ("Claim 15"); the Sixteenth Cause of Action against Newcourt and CIP

for breach of fiduciary duty ("Claim 16"); the Seventeenth Cause of Action against Newcourt and

CIP for breach of duty of good faith and fair dealing ("Claim 17"); the Eighteenth Cause of Action

against Newcourt and CIP for conversion ("Claim 18"); and the Nineteenth Cause of Action

against all defendants for unjust enrichment ("Claim 19").

Upon Algonquin's motion before the North Carolina bankruptcy court, by order dated

December 31, 2001, the Honorable A. Thomas Small, United States Bankruptcy Judge, transferred

venue of all five bankruptcy cases and the accompanying adversary proceedings to this Court.  (Ex.

A to the Griffith Declaration.)   Notably, prior to the transfer, Debtors moved to reject the

Management Agreement and to hire Mercer Construction Company, LLC to manage the Power

Projects, which Judge Small denied by order dated November 7, 2001.  (Ex. F to Algonquin's

Statement of Material Facts not in Dispute.)   Accordingly, the parties have therefore been

inextricably tied to one another for all these years, all the while fiercely litigating against one

another.  Judge Small also entered an order on December 11, 2001, permitting Algonquin to setoff

or recoup its pre-petition claim for management fees under the Management Agreement.  (Ex. E

to Algonquin's Statement of Material Facts not in Dispute.)

 In the Adversary Complaint, Debtors and Marina generally allege as follows:

 The Algonquin Defendants, themselves and in concert with the Lenders [defined as "Aetna, Newcourt and CIP"] have caused and continue to cause damage and loss to the Debtors and their respective estates through:
 a. failing to competently, prudently and faithfully manage and operate the Debtors' various Power Projects;
 b. failing to properly and fully account for and pay over revenues due to Debtors for or an account of electric power generated at and sold from the Power Projects;
 c. failing to properly and timely pay expenses incurred in the operation of the Power Projects;
 d. failing to properly and timely provide tax information relevant to the operation of the Power Projects and necessary to file required tax returns;
 e. converting the Power Projects to their own use and control;
 f. wrongfully holding themselves out to be the owners of the Power Projects;
 g. wrongfully interfering with the contractual rights and relationships of the Plaintiffs; and
 h. converting corporate opportunities of the Debtors to their own purpose, design and benefit while holding positions as agents and fiduciaries of the Debtors.

(Adv. Compl. & 5.)

 In 2002, Algonquin moved to withdraw the reference of the adversary proceedings.  Shortly

thereafter, the parties cross-moved for partial summary judgment.  Given the factual underpinnings

of the Adversary Complaint and the pending state and federal litigation, Former Chief Judge

Gerling directed the parties to brief whether this Court had subject matter jurisdiction over all

claims asserted therein.  Former Chief Judge Gerling issued a slip opinion containing a Report and

Recommendation that Claims 7 through 15 be severed from the adversary proceedings and that

reference be withdrawn as to Claims 7 through 13 and Claims 14 and 15 with respect to the New

York Projects such that they could be consolidated with the First District Court Action, which the

District Court subsequently adopted.  The District Court noted that Claims 14 and 15 duplicated

claims set forth in the First and/or Second District Court Action.  Former Chief Judge Gerling also

permissibly abstained from hearing Claims 16-18.   *Trafalgar Power, Inc. v. Algonquin Power Corp., Inc.*, Ch. 11 Case No. 01-67451, Adv. No. 02-80005, slip. op. at 18-19 (Bankr. N.D.N.Y. June 20, 2003).  In doing so, Former Chief Judge Gerling "recognized that [the Court] will be bound by the determinations made by the District Court and State Court and that *res judicata* and collateral estoppel may apply to the remaining causes of action asserted in the adversary proceeding," including Claim 4 for equitable subordination.  By Order dated November 6, 2003, Judge Hurd adopted Former Chief Judge Gerling's Report and Recommendation and withdrew Claims 7 through 13 and Claims 14 and 15 with respect to the New York Project and consolidated them with the First District Court Action.  (Ex. C to the Griffith Declaration.)

On December 28, 2006, Debtors commenced another adversary proceeding against Algonquin by filing an Adversary Complaint seeking a determination pursuant to §§ 502 and 506 as to the validity, priority, or extent of Algonquin's interest in the escrowed funds derived from the Malpractice Judgment ("Debtors' 2006 Adversary Proceeding").[10]  Debtors' 2006 Adversary Proceeding had its genesis in the Second District Court Action.  377 B.R. at 34.

### III.    The Current State of Affairs

#### A.    The Consolidated District Court Actions

Algonquin, Aetna, and Trafalgar separately moved for partial summary judgment in the Consolidated District Court Actions.  Algonquin and Aetna sought a judgment dismissing all claims related to the B Note.  In addition to moving for partial summary judgment, Trafalgar moved for leave to supplement the record on summary judgment.  The District Court defined the "central issue" in this litigation as "whether Trafalgar properly exercised its right to purchase thus entitling it to the B Note" and noted that "[e]very cause of action at issue regarding the B Note

---

[10] Debtors' 2006 Adversary Proceeding was assigned Adversary Proceeding Number 06-80302.  Documents filed in Debtors' 2006 Adversary Proceeding will be referred to herein as ("ECF 2006 Adv. No. __").

rests upon the propriety of TPI's attempt to exercise its right to purchase." 427 F. Supp. at 209. The District Court determined that summary judgment was appropriate because what remained was purely an issue of law as to whether Trafalgar met the requirements of the 1996 [Revised Loan] Agreement in attempting to exercise its right of first refusal to purchase the B Note." *Id.* at 210. In rendering its decision, the District Court stated the following:

> If TPI comported with the 1996 Agreement requirements, then issues regarding TPI's causes of action, such as whether Aetna and Algonquin breached fiduciary duties and fraudulently prevented TPI from taking possession of the B Note, remain for determination. However, if TPI failed to comply with the requirements for exercising its first refusal rights, then the transfer to Algonquin was proper and the story is ended.

*Id.* The District Court found that Steckler failed to timely tender the balance of the purchase price to Aetna as required by Algonquin's "Notice of Exercise" provided by Aetna to Trafalgar and that Trafalgar failed to comply with the remaining requirements to complete the purchase by a date certain as set forth in the "Term Sheet" provided by Algonquin to Aetna in conjunction with its offer. Accordingly, the District Court concluded that Trafalgar forfeited its right to purchase the B Note and Aetna was free to sell it to Algonquin. *Id.* In so doing, the District Court rejected all other arguments made by Trafalgar in its attempt to save its right to purchase the B Note. The District Court granted Algonquin and Aetna's motion for summary judgment dismissing Trafalgar's claims against them relating to the B Note and denied Trafalgar's cross-motion for summary judgment.

In 2008, Algonquin moved for summary judgment to dismiss Trafalgar's and Marina's identical remaining withdrawn claims unrelated to the B Note, including Claims 12, 14 and 15 for conversion, breach of fiduciary duty, and negligent management, respectively. Algonquin also moved for partial summary judgment on its counterclaims. Trafalgar opposed and cross-moved for leave to file a Second Amended and Supplemental Complaint. Among other amendments,

Trafalgar sought to include a claim for breach of contract against Algonquin for Algonquin's alleged 1997 breach of the 1995 Letter Agreement in connection with Algonquin's acquisition of the A and B Notes.

The District Court denied Trafalgar's motion to amend the complaint. 396 B.R. at 592. The District Court held in the first instance that Trafalgar's breach of contract claim was barred by the statute of limitations, which expired in 2003, and it subsequently rejected Trafalgar's relation back argument on the basis that Algonquin had not been put on notice that its activities prior to the Management Agreement were at issue in the First District Court Action. *Id.* The District Court granted summary judgment in favor of Algonquin and Aetna and dismissed all of Trafalgar's remaining claims.

The District Court also denied Algonquin's motion for partial summary judgment and dismissed its counterclaims. The District Court concluded that Algonquin was not entitled to judgment on its counterclaims because none of the post-default provisions in the Indenture Agreement were followed by Algonquin or State Street and the event of default was cured by the State Street's payment of taxes pursuant to Algonquin's direction. The District Court reasoned that Algonquin's position could not be rehabilitated "given its and the Security Trustee's failure to follow the appropriate procedures set forth in the Indenture Agreement coupled with the subsequent eradication of the alleged event of default," *id.* at 597; thus, Algonquin was incorrect in its assumption that by virtue of acceleration of the Aetna loan it now owned all of Trafalgar's stock pursuant to the Stock Pledge Agreements, and by virtue of owning all the stock it owned the New York Projects.

Algonquin and Trafalgar appealed the District Court's adverse decisions.[11]  The Second

Circuit, in what it described as a "complex web of litigation," concluded as follows with respect

to Algonquin's motions for complete and partial summary judgment:

> Virtually all of Trafalgar's claims turn on Aetna's sale of the A and B Notes to
> Algonquin, and, specifically, whether those sales violated Trafalgar's contractual
> right of first refusal.  The district court concluded that, with respect to both sales,
> Trafalgar had failed to properly exercise that right, and, accordingly, that Aetna had
> permissibly sold the Notes to Algonquin.  We agree.
>
> . . .
>
> [F]or substantially the same reasons as set forth by the district court in its Opinion
> and Order dated November 6, 2008, we agree that Algonquin was entitled to
> summary judgment on Trafalgar's remaining claims which alleged conversion,
> breach of fiduciary duty, and negligent management against Algonquin only.

401 F. App'x at 587–88.  The Second Circuit concluded as follows with respect to

Trafalgar's motion to amend the complaint:

> We discern no abuse of discretion in the district court's denial of leave to amend
> on this record.
>
> . . .
>
> We are unable to agree with the district court's conclusion that Algonquin's notice
> was deficient. . . .
>
> Here, there is no dispute that Trafalgar received actual, timely notice of the
> acceleration.  Moreover, we can discern no evidence in the record to suggest that
> Trafalgar was somehow prejudiced by receiving that notice from Algonquin
> directly rather than from State Street. . . .  We therefore are unable to agree with the
> district court that Algonquin's slight noncompliance in this respect warranted
> summary judgment or dismissing the counterclaims.

*Id.* at 589–90.  Accordingly, the Second Circuit in its unpublished Summary Order affirmed the

District Court's opinions insofar as they granted summary judgment in favor of Algonquin and

Aetna on each of Trafalgar's claims and denied Trafalgar's motion for leave to amend the

---

[11] The appeals did not disturb the District Court's 2008 dismissal of the Second District Court Action in its entirety.

complaint, but vacated and remanded insofar as the District Court denied summary judgment on

Algonquin's counterclaims.  The Second Circuit issued a February 1, 2011 Mandate directing the

District Court to determine the following questions: (1) whether an Event of Default occurred and;

if so, (2) whether Algonquin properly exercised its rights as the holder of the A and B Notes

pursuant to the Loan Documents such that Algonquin would be entitled to summary judgment on

its counterclaims.

Once back in the hands of the District Court, the District Court answered both questions

affirmatively in favor of Algonquin.  The District Court determined that an Event of Default

existed under the Indenture Agreement for the following reasons: (1) Steckler knew that Trafalgar

had failed to pay its 1996 and 1997 corporate income taxes when due and more than ten days went

by after Steckler knew that Trafalgar failed to timely pay its corporate income taxes; and (2)

Trafalgar failed to timely pay the IRS within thirty days of its issuance of the Notice of Levy, of

which Steckler knew about for at least ten days.  2012 U.S. Dist. LEXIS 46945, at *10.  The

District Court rejected Trafalgar's argument that Algonquin fabricated the default by wrongly

refusing to pay the overdue income taxes upon finding that Steckler did not, as Trafalgar argued,

direct Algonquin to pay the IRS and, even if he had done so, Algonquin could not have complied

with this request because payment of overdue income taxes was not specified in the Management

Agreement as a permitted disbursement from Trafalgar's operating accounts.

Having determined that Trafalgar's inaction with respect to the payment of its corporate

income taxes and the IRS's Notice of Levy triggered an Event of Default under the Loan

Documents, the District Court turned its attention to whether Algonquin properly exercised its

right to accelerate the debt due and, additionally, whether it was entitled to do so when it had cured

the default by paying Trafalgar's income taxes on September 20, 1999.  The District Court noted

that Trafalgar instituted the First District Court Action rather than cure the non-payment of its taxes, and it found that "[t]he later payment of the taxes [by Algonquin] to remove the lien was a specifically-provided remedy [in the Indenture Agreement] in the event that a default existed, . . . properly exercised by Algonquin and the Security Trustee," *id.* at *15, and did not constitute a "Cure" of Trafalgar's default under the Loan Documents.   The District Court concluded that Algonquin was entitled to the remedies provided under the Loan Documents, including enforcement of its rights as against the pledged collateral, because it had substantially complied with the Indenture Agreement in that Trafalgar received actual, timely notice of Algonquin's acceleration of the debt due under the A and B Notes and it was not prejudiced by the fact that it received such notice from Algonquin rather than State Street. *Id.* at *16.  Accordingly, the District Court granted Algonquin's motion for summary judgment on its counterclaims and directed the Clerk of Court to file an amended judgment in favor of Algonquin and close the file. *Id.* at *19–20.

Trafalgar filed a final appeal to the Second Circuit.  At this point, only the B Note remained unpaid and at issue.  The Second Circuit promptly disposed of the appeal after rendering three principal conclusions: (1) a close reading of the Loan Documents revealed that Trafalgar's failure to pay its corporate income taxes constituted an Event of Default; (2) Trafalgar knew about the Event of Default, received actual and timely notice of the acceleration, and was not prejudiced in any way by the form of the notice; and (3) Algonquin was entitled to recourse against Trafalgar's stock.  515 F. App'x at 58–59.  Accordingly, the Second Circuit affirmed the amended judgment of the District Court, putting a long awaited end to the First District Court Action.

B.      The New Hampshire Action

On or about July 2004, the parties entered into a Settlement Agreement whereby Franklin and Steckler, jointly and severally, agreed to pay APF $2.75 million in full satisfaction of the claims asserted by APF upon the conclusion of the First District Court Action from the escrowed Malpractice Judgment funds.  The Settlement Agreement was so ordered by the New Hampshire State Court on July 1, 2004, and approved by Former Chief Judge Gerling on or about December 10, 2004.  The New Hampshire Action was subsequently dismissed with prejudice.

C.      Debtors' 2006 Adversary Proceeding

In deciding the parties' cross-motions for summary judgment, Former Chief Judge Gerling concluded that Algonquin did not have a valid interest in the escrowed proceeds of the Malpractice Judgment.  That ruling was predicated in part upon Former Chief Judge Gerling's finding that the District Court's earlier ruling on Algonquin's motion for a preliminary injunction and order of attachment, wherein the District Court determined that Algonquin did not have a security interest in the Malpractice Judgment, was preclusive and therefore determinative of the issue in Debtors' 2006 Adversary Proceeding.  377 B.R. at 51–52.  Accordingly, Former Chief Judge Gerling granted Debtors' motion for summary judgment and denied Algonquin's motion for summary judgment.

Algonquin appealed the decision and the District Court affirmed the same.  396 B.R. at 110.  Algonquin appealed the District Court's affirmance and the Second Circuit vacated the District Court's decision on the ground that the District Court erroneously applied the doctrine of collateral estoppel and remanded the case to the District Court for consideration of the merits of Algonquin's claimed security interest in the proceeds of the Malpractice Judgment.  362 F. App'x at 156.  Upon remand, the District Court again affirmed Former Chief Judge Gerling's decision in

its entirety.  466 B.R. at 187.  Algonquin appealed the District Court's affirmance.  The Second

Circuit held that the 1988 Consolidation Agreement between Trafalgar and Aetna, which was

executed as part of the original Aetna Loan, as altered by the Modification Agreement, assigned a

security interest in the tort claim to Algonquin pursuant to New York common law.  509 F. App'x

at 86 n.2.  Consequently, the Second Circuit reversed the judgment of the District Court and

remanded the case back to the District Court with directions to enter judgment in favor of

Algonquin.  *Id.* at 88.  By Decision and Order issued on June 26, 2013, the District Court reversed

Former Chief Judge Gerling's October 30, 2007 decision and remanded the proceeding back to

this Court for entry of judgment in favor of Algonquin.  2013 U.S. Dist. LEXIS 89341, at *2.  On

September 23, 2013, this Court entered an Order on the parties' cross-motions for summary

judgment as directed by the District Court.  (ECF 2006 Adv. Pro. No. 102.)  Accordingly, it is

settled that Algonquin has a valid security interest in the Malpractice Judgment and escrowed

proceeds derived therefrom.

> D.   *Claims Remaining Before this Court in Debtors' and Marina's Adversary Proceedings*

In their Joint Opposition to Algonquin's Motion for Summary Judgment, Debtors and

Marina withdrew Claims 2, 3, 5, and 19.  (Debtors' Joint Opp'n to Algonquin's Mot. for Summ.

J. 6 n.2.)  Thus, Claims 1, 4, and 6 remain for the Court's present consideration and adjudication.

## ARGUMENTS

I.   *Debtors' Partial Summary Judgment Motion*

Debtors' Partial Summary Judgment Motion is premised entirely on the defense of

recoupment.  The Summary Judgment Record and arguments espoused by counsel for Debtors and

Marina at oral argument make clear that Debtors are seeking a determination solely on the question

of law as to whether they are entitled to utilize the defense.  By virtue of this defense, Debtors

ultimately seek to expunge the Algonquin Claims based on their asserted right to recoup all amounts due Algonquin as a result of Algonquin's acquisition of the A and B Notes without Trafalgar's consent in an alleged breach of the 1995 Letter Agreement.

While Debtors acknowledge that they could not now pursue a similar claim for affirmative recovery given the Second Circuit's affirmance of the District Court's ruling that such breach of contract claim was time-barred, 401 Fed. App'x 588–89, they argue that they may defensively use recoupment because the defense survives the statute of limitations. Debtors set forth a plethora of case law in support of this proposition. Preliminarily, Debtors argue that recoupment is applicable here because the Algonquin Claims under the outstanding B Note and their recoupment defense involve the same set of underlying facts and interrelated and reciprocal contractual relationships.

The factual underpinning of Debtors' recoupment defense is Algonquin's alleged breach of the 1995 Letter Agreement, which Debtors contend has not been adjudicated by the District Court. In their Joint Supplemental Memorandum of Law, Debtors and Marina aver that in the First District Court Action against Aetna for breaching Aetna's contractual obligation to sell the A and B Notes to Trafalgar and against Algonquin for interfering with that contract, the parties did not litigate and the District Court did not therefore decide the following independent issues: (1) whether Algonquin's refusal to comply with its commitment to obtain Trafalgar's consent to acquire the A and B Notes breached the separate 1995 Letter Agreement; and (2) damages Algonquin's alleged breach caused when it acquired the A and B Notes. In this respect, Debtors assert that the 1995 Letter Agreement remained in force notwithstanding the Restructured Aetna Loan transaction and a definitive breach by Algonquin occurred because Trafalgar neither gave its consent for Algonquin to purchase the A and B Notes nor waived the consent requirement.

Algonquin disputes Debtors and Marina's narrow characterization of the First District Court Action as concerning only the validity of Aetna's sale of the A and B Notes to Algonquin in relation to Trafalgar's right of first refusal and Algonquin's subsequent ownership of the same and asserts that Debtors may not resurrect Trafalgar's time-barred breach of contract claim as an affirmative defense to effectuate an end run around the decisions of the District Court and Second Circuit in the Consolidated District Court Actions.  Algonquin emphasizes that both the District Court and Second Circuit determined that Algonquin properly acquired the A and B Notes and Trafalgar was in default, such that Algonquin is entitled to enforce its remedies against the collateral and Debtors' bankruptcy estates.

Algonquin views the Consolidated District Court Actions as separate and distinct from Debtors' bankruptcy cases and Debtors' and Marina's adversary proceedings, which in turn lays the foundation for its argument that Debtors are now precluded from raising and relying upon an alleged breach of the 1995 Letter Agreement.  Algonquin argues that all issues related to its ownership of or allowance of monies due under the B Note were actually and extensively litigated in the Consolidated District Court Actions.  Algonquin further contends that a breach of the 1995 Letter Agreement is a "legal theory" upon which claims for damages rest and points out that such claims were rejected by the District Court and Second Circuit in the First District Court Action, wherein Trafalgar and Marina had an obligation to assert every single theory and remedy with respect to Algonquin's acquisition of the A and B Notes.  Algonquin argues that Debtors cannot avoid the preclusive doctrines to make up for Trafalgar and Marina's poor tactical choices in the First District Court Action by now setting forth a different contract theory or seeking a different remedy, i.e., recoupment as a result of Algonquin's purchase of the A and B Notes in an alleged

breach of the 1995 Letter Agreement versus damages arising from Algonquin's purchase of the A and B Notes in derivation of Trafalgar's right of first refusal.

Even if Debtors could avoid the application of the preclusive doctrines, Algonquin submits that the 1995 Letter Agreement was not violated but rather was followed or superseded by the 1996 Aetna Loan restructuring because the Loan Documents explicitly authorized Algonquin to make a purchase offer on the A and B Notes and for Aetna to enter into any agreement or arrangement with Algonquin to sell the A and B Notes, subject only to Trafalgar's right of first refusal. By commencing the First District Court Action based on a breach of the Loan Documents, Algonquin contends that Trafalgar and Marina implicitly acknowledged that the Loan Documents superseded the 1995 Letter Agreement. Further, even if Debtors are entitled to the defense of recoupment and could prove the substantive merits upon which the defense rests, both of which Algonquin disputes, Algonquin contends that Debtors could not prove damages because if the B Note were not payable to Algonquin, it would inevitably be payable to some other entity absent forgiveness. Algonquin maintains, in sum, that Debtors are not entitled to any remedy with respect to Algonquin's ownership of or entitlement to payment under the outstanding B Note.

Debtors and Marina responsively argue that even if the Court determines that the preclusive doctrines apply to the facts at hand, the Court can and should in the interest of equity ignore the same where Judge Hurd specifically directed the parties to litigate the issue of recoupment and damages in this forum.

II.    *Algonquin's Motion for Summary Judgment*

In its simplest form, Algonquin's argument is that all three of Debtors' and Marina's remaining claims in their adversary proceedings have either been settled by the Settlement Agreement in the New Hampshire Action or dispensed with by the District Court's final dismissal

of all claims–whether arising under the Management Agreement or in relation to the Aetna Loan and Restructured Aetna Loan–relating to Debtors and Marina's allegations of wrongdoing by Algonquin.  This argument closely mirrors Algonquin's primary argument in opposition to Debtors' Partial Summary Judgment.  With respect to Claim 4 for equitable subordination, Algonquin contends that Debtors and Marina are precluded from pursuing this claim given the District Court and Second Circuit rulings in the Consolidated District Court Litigation that Algonquin's conduct in acquiring the A and B Notes, and in pursuing its remedies upon Trafalgar's subsequent default, was proper under the applicable contractual documents.  Again, Algonquin contends that where Trafalgar and Marina affirmatively chose to assert tort claims rather than a breach of contract claim initially in the First District Court Action in order to avoid a mandatory arbitration provision within the Management Agreement, Debtors may not resurrect a breach of contract claim now based upon a different legal theory also premised upon Algonquin's alleged breach of the 1995 Letter Agreement.

Similarly, Algonquin contends that Debtors and Marina are precluded from pursuing Claims 1 and 6 for fraudulent transfers under bankruptcy and state law, respectively, related to Algonquin's receipt of management fees and operational expenses under the Management Agreement.  Algonquin bases its position upon the Second Circuit's determination that Algonquin is the holder of a valid claim secured in essentially all of Trafalgar's assets, and upon the fact that prior to the transfer of Debtors' bankruptcy cases to this Court, Judge Small acknowledged in the context of his December 11, 2001 Order that APC was entitled to setoff or recoup its pre-petition claim for management fees under the Management Agreement.  (*See* Ex. E to Algonquin's Statement of Material Facts not in Dispute.)  Furthermore, Algonquin contends that Debtors and Marina are bound by the District Court's dismissal in the Consolidated District Court Litigation

of all claims by Trafalgar related to APC's alleged mismanagement or breaches of obligations under the Management Agreement, which was affirmed by the Second Circuit.  Substantively, Algonquin asserts that Debtors and Marina have not provided sufficient factual information regarding a single fraudulent transfer that would entitle them to relief under either Claim 1 or Claim 6.

Pragmatically, Algonquin contends that all of Debtors' and Marina's remaining causes of action must be dismissed as against APIF and APF outright because APC is the only Algonquin entity that is a party to the Management Agreement.

In opposition to Algonquin's Motion for Summary Judgment, Debtors and Marina restate their arguments raised in defense of Debtors' Motion for Partial Summary Judgment regarding the inapplication of the preclusive doctrines to Debtors' bankruptcy cases and Debtors' and Marina's adversary proceedings.  Debtors and Marina reassert that the issues underlying their remaining substantive claims have not been addressed by the District Court and, thus, the Second Circuit. Accordingly, under the split jurisdictional framework of Debtors' bankruptcy cases and Debtors' and Marina's adversary proceedings, Debtors and Marina contend that this is their first opportunity to litigate Claims 1, 4, and 6.

Moreover, Debtors assert that they have presented summary judgment evidence in the form of a report prepared by their expert retained in connection with the Consolidated District Court Actions, Thomas Bonadio of The Bonadio Group (the "Bonadio Report," Ex. B to Debtors' and Marina's Joint Memorandum in Opposition to Algonquin's Motion for Summary Judgment), that allegedly creates a disputed material fact issue concerning whether Algonquin effected improper disbursements to itself from Debtors' operational accounts in violation of both state law and the parties' Management Agreement.  While Algonquin contends that the Bonadio Report is pure

opinion that, at best, would be relevant to Debtors' barred breach of contract claims against

Algonquin under the Management Agreement, Debtors heavily rely upon the Bonadio Report and

a subsequent report prepared by The Bonadio Group (the "Bonadio Rebuttal Report," Ex. E to

Debtors' and Marina's Joint Memorandum in Opposition to Algonquin's Motion for Summary

Judgment), in order to keep Claims 1 and 6 alive.

Further, Debtors and Marina suggest that the Court should disregard Algonquin's argument

in support of dismissal as against APIF and APF in keeping with the precedent set by the District

Court and Second Circuit, whom, according to Debtors, have treated the Algonquin corporations

as a single entity.

## DISCUSSION

*I.     The Summary Judgment Standard*

As the First Circuit noted years ago, "[t]he summary judgment standard is familiar and has

been frequently elucidated," such that there is no need to attempt to "reinvent so serviceable a

wheel. . . ." *In re Newport Plaza Assoc., L.P.*, 985 F.2d 640, 643 (1st Cir. 1993). Judge Hurd

recited the summary judgment standard in his latest decision in the Consolidated District Court

Actions as follows:

> Summary judgment must be granted when the pleadings, depositions,
> answers to interrogatories, admissions and affidavits show that there is no genuine
> issue as to any material fact, and that the moving party is entitled to summary
> judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*,
> 477 U.S. 242, 247 (1986). The moving party carries the initial burden of
> demonstrating an absence of a genuine issue of material fact. Fed. R. Civ. P. 56;
> *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts, inferences therefrom,
> and ambiguities must be viewed in a light most favorable to the nonmovant.
> *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
>      When the moving party has met the burden, the nonmoving party 'must do
> more than simply show that there is some metaphysical doubt as to the material
> facts.' *Id.* at 586. At that point, the nonmoving party 'must set forth specific facts
> showing that there is a genuine issue for trial.' Fed. R. Civ. P. 56; *Liberty Lobby,
> Inc.*, 477 U.S. at 250; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. To withstand

> a summary judgment motion, sufficient evidence must exist upon which a
> reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477
> U.S. at 248–49; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

2012 U.S. Dist. LEXIS 46945, at *6 (internal parallel citations omitted).   "One of the principal

purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims

or defenses. . . ." *Celotex Corp.*, 477 U.S. at 323–24.   The trial court's role at this stage of the

litigation is not to decide issues of material fact, but to discern whether any exist. *Gallo v.*

*Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see Vermont Plastics*

*v. Brine, Inc.*, 79 F.3d 272, 276 (2d Cir. 1996) (In considering the evidence, the trial court may not

weigh evidence or assess credibility.).

The Court recognizes that "[s]ummary judgment is an appropriate method for resolving a

claim of res judicata." *Tibbetts v. Stempel*, 354 F. Supp. 2d 137, 144 (D. Conn. 2005) (citing

*Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 712 (Conn. 1993) (internal parallel citation

omitted); *Media Group, Inc. v. Tuppatsch*, 298 F. Supp. 2d 235, 241 (D. Conn. 2003); *NAS Elects.*

*PTE, Ltd.*, 262 F. Supp. 2d 134, 152 (S.D.N.Y. 2003)).

II.    *Debtors' Partial Summary Judgment Motion*

Notwithstanding that the burden of proof resides with Debtors, the Court finds that Debtors

and Marina present very general, incomplete arguments in support of Debtors' Partial Summary

Judgment Motion.   Debtors address only whether they are estopped from asserting their defense

of recoupment to the Algonquin Claims.   Although their narrow focus is understandable given the

parties' litigious history, the parties have spent little time addressing the elements of recoupment.

The Court can follow suit and avoid doing so if Algonquin can demonstrate that Judge Hurd's

denial of Trafalgar's right to amend the complaint in the First District Court Action to include a

claim for breach of contract related to the 1995 Letter Agreement, together with the full findings

of the District Court in the Consolidated District Court Actions, collaterally estop Debtors from

now arguing that Algonquin committed any wrongdoing against Trafalgar when it acquired the A

and B Notes from Aetna.

"Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of

protecting litigants from the burden of relitigating an identical issue with the same party or his

privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery

Co. v. Shore*, 439 U.S. 322, 327 (1979) (citing *Blonder-Tongue Laboratories, Inc. v. Univ. of

Illinois Found.*, 402 U.S. 313, 328–29 (1971)). Under the doctrine of collateral estoppel, a

judgment in a prior suit upon a different cause of action precludes relitigation of issues actually

litigated and necessary to the outcome of the first action. *Id.* at 327 n.5 (collecting cases).

Generally, collateral estoppel applies when four elements are met: "(1) the identical issue was

raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous

proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution

of the issue was 'necessary to support a valid and final judgment on the merits.'"[12] *Interoceanica

Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (quoting *Central Hudson Gas & Elec.

v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995) (citing *Davis v. Halpern*, 813 F.2d

37, 29 (2d Cir. 1987))). The parties' analyses focus principally on the second element of collateral

estoppel. As the party asserting collateral estoppel, Algonquin bears the burden of identifying the

precise issues litigated in the prior action and establishing a record sufficient to reveal the

controlling facts. *Denton v. Hyman (In re Hyman)*, 335 B.R. 32, 38 (Bankr. S.D.N.Y. 2005) (citing

*Comm. Mut. Sav. Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 312 n.5 (Bankr. S.D.N.Y. 1994)),

---

[12] In the context of Debtors' Partial Summary Judgment Motion, the parties do not distinguish between federal and state preclusion doctrines and principles. As explained below and for the reasons stated therein, the Court applies federal law here. *See* Discussion *infra* pp. 39–40.

*aff'd*, 502 F.3d 61 (2d Cir. 2007). "'Any reasonable doubt as to what was previously decided by a prior judgment should be resolved by deciding against using it as estoppel.'" *Id.* (quoting *Zohlman v. Zoldan (In re Zoldan)*, 226 B.R. 767, 772 (S.D.N.Y. 1998)).

According to Algonquin, the issue of any wrongdoing by Algonquin was "actually litigated" and resolved in the Consolidated District Court Actions. The Court, however, disagrees. Given the split jurisdictional framework of the parties' litigation and as acknowledged by Judge Hurd when asked by Algonquin to withdraw the reference, this issue was not "actually litigated" or resolved in the Consolidated District Court Actions but rather was retained by this Court under its jurisdiction to decide Debtors' defenses to the Algonquin Claims and Debtors' and Marina's Claim 4 for equitable subordination. The Court's holding that Debtors are not collaterally estopped from raising and litigating their recoupment defense is supported by Judge Hurd's narrow characterization of the "central issue" in the First District Court Action as "whether Trafalgar properly exercised its right to purchase [the B Note given Trafalgar's attempt to exercise its right of first refusal] thus entitling it to the B Note." 427 F. Supp. 2d at 209. The District Court expressly stated that it was considering a discrete issue. The District Court's iteration of this issue, together with a careful reading of the decisions issued by the Second Circuit and the District Court in the Consolidated District Court Actions, in turn compel this Court to reject Algonquin's argument to give the District Court's prior judgment collateral estoppel effect here.

As it must, the Court now turns to a discussion of the applicable law. "While not defined in the Bankruptcy Code, the Code contemplates and accepts the equitable doctrine of recoupment. Recoupment is essentially a right to reduce the amount of a claim." *In re Sweet N Sour 7th Ave. Corp.*, 431 B.R. 63, 70–71 (Bankr. S.D.N.Y. 2010) (citing 5 COLLIER ON BANKRUPTCY &553.10) (15th ed. rev. 2004)). Recoupment is an equitable doctrine of limited application in bankruptcy

cases; it typically arises in cases involving a credit and debt arising out of a transaction for the same goods or services. *Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 466 (Bankr. S.D.N.Y. 2007) (collecting cases); *Delta Air Lines, Inc. v. Bibb (In re Delta Air Lines)*, 359 B.R. 454, (Bankr. S.D.N.Y. 2006) (citing *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1402–03 (9th Cir. 1996) (internal citation omitted)); *Pereira v. Summit Bank*, 2001 U.S. Dist. LEXIS 1712, at *33 (S.D.N.Y. Feb. 21, 2001) ("'The classic recoupment right occurs when a buyer erroneously overpays a seller for goods or services.'") (quoting *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984)). Recoupment, however, is also available to a debtor who is objecting to a proof of claim. *Rutledge v. Wells Fargo Bank, N.A. (In re Rutledge)*, 510 B.R. 491, 510 (Bankr. M.D.N.C. 2014) (collecting cases).

The doctrine of recoupment is a narrow one and the "decision to allow recoupment is to be made on a case-by-case basis." *Sacramento Mun. Util. Dist. v. Mirant Americas Energy Mktg., LP (In re Mirant Group)*, 318 B.R. 377, 380 (Bankr. N.D. Tex. 2004) (citing cases). In determining whether a party has the right of recoupment, the court must apply nonbankruptcy law. *Westinghouse Credit Corp., Inc. v. D'Urso*, 278 F.3d 138, 146 (2d Cir. 2002) (citing *N.Y. State Elec. & Gas Co. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir. 1997)). In this case, pursuant to Article 14.8 of the Management Agreement, New York law governs the relationship between Trafalgar and Algonquin and, therefore, this Court's recoupment analysis and determination. "In New York, to assert a defense of recoupment, a party must have a 'legally subsisting cause of action upon which it could maintain an independent claim,'" *Hispanic Indep. Television Sales, LLC v. Kaza Azteca Am., Inc.*, No. 10 Civ. 932, 2012 U.S. Dist. LEXIS 46239, at *15 (S.D.N.Y. Mar. 30, 2012) (quoting *In re Stock Exchs. Options Trading Antitrust Litig.*, No. 99 Civ. 0962, 2005 U.S. Dist. LEXIS 13734, at *45 (S.D.N.Y. July 8, 2005)), and the "claim of

recoupment must arise 'out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations,'" *id.* (quoting *Westinghouse*, 278 F.3d at 147 (citing *Malinowski v. N.Y. Sate Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir. 1998))).

The Second Circuit and courts within the Circuit have spoken extensively on this standard, focusing almost exclusively on the "single integrated transaction test." *See id.*, 2012 U.S. Dist. LEXIS 46239, at *16 (noting that the Court could not find any binding authority that speaks to the meaning of a "legally subsisting" claim, but concluding that existing New York case law is extremely generous in defining the same). Here, the Court finds that Debtors have a "legally subsisting cause of action," namely a breach of contract claim related to the 1995 Letter Agreement and/or the Management Agreement. Debtors are correct that they are not jurisdictionally barred from asserting a defense of recoupment based upon Algonquin's alleged breach of the 1995 Letter Agreement even though the District Court held that Trafalgar was time-barred from bringing a breach of contract claim for affirmative recovery in the Consolidated District Court Actions. *See, e.g.*, *118 East 60th Owners Inc. v. Bonner Props., Inc.*, 677 F.2d 200, 203 (2d Cir. 1982) ("[A] defense that would be time-barred as a claim for affirmative relief may be used to reduce an adverse recovery where the defense establishes an equitable defect inhering in the adverse party's claim. The doctrine is founded in considerations of fairness; it would be highly inequitable to permit a party to place a question before the court and prevent the opposing party from disputing issues lying at the foundation of the claim."); *United States v. Forma*, 42 F.3d 759, 765 (2d Cir. 1994) ("[A] counterclaim seeking a set off or recoupment is properly conceptualized as a defense, arising out of the transaction that grounds the main action, and 'therefore' will not be jurisdictionally barred when there is jurisdiction for the main action.") (quoting *Bull v. United*

*States*, 295 U.S. 247, 262 (1935), and collecting cases); *In re Drexel Burnham Lambert Grp., Inc.*,

113 B.R. 830, 854 (Bankr. S.D.N.Y. 1990) ("[R]ecoupment [in bankruptcy] is purely defensive,

or in the nature of a common law defense, and not a separate cause of action or weapon of offense."

(internal citation and quotation marks omitted)). Debtors certainly are able to proceed with their

recoupment defense notwithstanding that they lack a presently existing affirmative claim.

*Hispanic Indep. Television Sales, LLC*, 2012 U.S. Dist. LEXIS 46239, at *19.

Like most courts who have decided the right of recoupment, the Court finds that the "single

integrated transaction test" element is dispositive in the present bankruptcy cases. "The right of

recoupment arises only in the context of a single contract or series of transactions constituting a

single, integrated transaction or contract." *In re Delta Air Lines*, 359 B.R. at 465; *Westinghouse*,

278 F.3d at 149 (cautioning that courts must take care in applying the doctrine of recoupment to

avoid "restructuring the transaction after the fact," as such restructuring would be inequitable).

"[I]n recoupment in bankruptcy, the term 'transaction' is given a more restricted definition [than

in the context of determining whether counterclaims are compulsory or permissive under the rules

of civil procedure]." *In re Malinowski*, 156 F.3d at 133 (citing *In re McMahon*, 129 F.3d at 97,

and comparing cases). For the recoupment doctrine to apply, the debts must arise from a set of

reciprocal contractual obligations or from the same set of facts; "'a mere logical relationship is not

enough' to warrant recoupment in the bankruptcy context." *Id.* at 133–34 (quoting *In re Univ.*

*Med. Ctr.*, 973 F.2d 1065, 1081 (3d Cir. 1992)); *In re Delta Air Lines*, 359 B.R. at 467 ("The

Second Circuit requires more than a mere logical relationship . . . to bring . . . mutual debts within

the same transaction.") (internal citation and quotation marks omitted)). The standard is strict,

such that even where a single contract is involved, "[w]here the contract itself contemplates the

business to be transacted as discrete and independent units, even claims predicated on a single

contract will be ineligible for recoupment." *Id.* at 135 (citing *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 962–63 (10th Cir. 1996) (overarching distributorship agreement governed many different types of sales and related activities, which were considered separate transactions); *California Canners & Growers, Inc. v. Military Distribs. of Virginia (In re California Growers & Canners)*, 62 B.R. 18 (B.A.P. 9th Cir. 1986) (each delivery under contract a separate transaction)).  In order for the right of recoupment to be exercised in bankruptcy, there must be a significant degree of interconnectedness between the obligations at issue.  *In re Delta Air Lines*, 359 B.R. at 466 (citing 5 COLLIER ON BANKRUPTCY & 553.10[1] (15th ed. rev. 2006)). In the words of the Second Circuit, "in light of the equitable nature of the recoupment remedy, the facts in the particular case are important" and the deciding court "simply cannot stretch the requirement of a single transaction, which is central to recoupment . . . ." *Malinowski*, 156 F.3d at 135.

Debtors have provided nothing more than a conclusory statement that they have satisfied the "single integrated transaction test."  The Court finds, however, that Debtors have not done so because their claim of recoupment does not arise out of the same transaction that forms the basis for the Algonquin Claims.  Rather, Algonquin's contractual and management obligations to Debtors under the 1995 Letter Agreement and the Management Agreement and Debtors' contractual obligation to pay Algonquin under the B Note originate from separate circumstances and are not in any way "reciprocal," *In re Malinowski*, 156 F.3d at 134, "contingent on one another," or "complementary," *Westinghouse*, 278 F.3d at 148.  Given the incredibly narrow scope of the recoupment doctrine and its "same transaction" requirement as illustrated and honed by a plethora of case law, it is not enough that the Management Agreement was mandated by the Revised Loan Agreement and that the A and B Notes were derived in connection with the same.

In fact, under the Revised Loan Agreement, Debtor could have hired any non-Debtor entity but chose to hire Algonquin. Further, the parties' respective obligations are too attenuated in terms of time to satisfy the same transaction test. Debtors and Algonquin entered into the 1995 Letter Agreement and the Management Agreement in 1995, whereas Algonquin did not purchase and acquire the A and B Notes from Aetna until 1996. While the parties' respective obligations may arise from related facts, they do not arise from the "same set of facts." As such, the theory of recoupment simply does not work here. Accordingly, Debtors' Partial Summary Judgment Motion must be denied.

III.     *Algonquin's Motion for Summary Judgment*

Algonquin moves for summary judgment on three distinct grounds: (1) res judicata; (2) collateral estoppel;[13] or, should the first two fail, (3) a lack of evidence to support the essential elements of Debtors' and Marina's remaining causes of action. Immediately, the Court notes that if Algonquin is entitled to summary judgment on the basis of res judicata or collateral estoppel, then the Court need not plunge into a merits analysis regarding Debtors' and Marina's Claims 1, 4, and 6.

Faced with determining the preclusive effect of a federal court judgment issued in a diversity case, the Court preliminarily recognizes that the Second Circuit has left open the question of whether state law or federal law controls. *Indus. Risk Insurers v. Port Auth.*, 493 F.3d 283, 288

---

[13] Notwithstanding the United States Supreme Court's adoption of the terms "claim preclusion" and "issue preclusion" when referring to the preclusive effect of a judgment under the overarching doctrine of "res judicata," *see Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008) (explaining that these new terms "have replaced a more confusing lexicon" and that "[t]he term 'res judicata' describes two discrete effects: (1) claim preclusion, which means a valid final adjudication of a claim precludes a second action on that claim or any part of the claim; and (2) issue preclusion, or 'collateral estoppel,' which means that an issue of fact or law, actually litigated and resolved by a valid final judgment, binds the parties in a subsequent action, whether on the same or a different claim"), the parties and the Court continue to use the traditional terms "res judicata" and "collateral estoppel" here.

(2d Cir. 2007) (comparing conflicting Second Circuit rulings on the issue).[14]  Algonquin contends

that it is entitled to judgment as a matter of law under either analysis.  Algonquin is correct that

this distinction between New York and federal preclusion law is of no consequence.  *See Pike v.*

*Freeman*, 266 F.3d 78, 90 n.14 (2d Cir. 2001) (There is "no significant difference between New

York's preclusion law and federal preclusion law."); *but see Indus. Risk Insurers*, 493 F.3d at 288

(Although these two bodies of law ultimately reach the same result, they do appear to diverge in

some particulars.).[15]  For present purposes, consistent with the majority of courts who have issued

opinions on the subject, the Court will cite and apply federal law.

The judicial doctrine of res judicata "is a rule of fundamental repose important for both

litigants and for society."  *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985) (citing

*Hart v. Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299 (1917)).  Its purpose is to foster judicial

economy and prevent piecemeal litigation.  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,

600 F.3d 190, 200 (2d Cir. 2010); *see also Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948

F.2d 869, 870 (2d Cir. 1991) ("Restraining litigious plaintiffs from taking more than 'one bite at

the apple' has been our avowed purpose since the common law doctrine of res judicata first

evolved."); *Tibbetts*, 354 F. Supp. 2d at 146 (Res judicata is meant to: "'(1) promote judicial

economy by minimizing repetitive litigation; (2) prevent inconsistent judgments which undermine

the integrity of the judicial system; and (3) provide repose by preventing a person from being

---

[14] The District Court's jurisdiction in the Consolidated District Court Action was based on diversity of citizenship.
427 F. Supp. 2d at 203.

[15] The Second Circuit indicated that the divergence applies only to collateral estoppel:

In *Gelb [v. Royal Globe Ins. Co.]*, we held that under federal law, 'if an appeal is taken and the
appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to
the unreviewed ground,' and that 'inability to obtain appellate review, or the lack of such review
once an appeal is taken, does prevent preclusion.'  798 F.2d at 44–45.  But, we have found no
equivalent New York holding.

*Indus. Risk Insurers*, 493 F.3d at 288 (footnote omitted).

harassed by vexatious litigation.'") (quoting *State v. Ellis*, 197 Conn. 436, 466 (1985) (internal

parallel citation omitted)).

"Under the doctrine of res judicata (claim preclusion), '[a] final judgment on the merits of

an action precludes the parties or their privies from relitigating issues that were or could have been

raised in that action.'" *Austin v. Downs, Rachlin & Martin*, 270 F. App'x 52, 53 (2d Cir. 2008)

(quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) (internal parallel citation

omitted)). Thus, res judicata "constitutes an absolute bar 'not only as to every matter which was

offered and received to sustain or defeat the claim or demand, but as to any other admissible matter

which might have been offered for that purpose.'" *Id.* (quoting *Interoceanica Corp.*, 107 F.3d at

90). "Res judicata therefore bars the subsequent litigation of any claims arising from the

transaction or series of transactions that was the subject of the prior suit." *Id.* (citing *Interoceanica

Corp.*, 107 F.3d at 90). Res judicata ordinarily applies if four elements are met with respect to the

earlier decision: (1) it was a final judgment on the merits; (2) by a court of competent jurisdiction;

(3) in a case involving the same parties or their privies; and (4) involving the same cause of action.

*In re Teltronics Servs., Inc.*, 762 F.2d at 190 (citing *Comm'r v. Sunnen*, 333 U.S. 591, 597 (1948);

*Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133 (2d Cir. 1975)).

Algonquin's core argument is that Debtors and Marina are barred by res judicata from

pursuing Claims 1, 4, and 6. In this respect, the parties' dispute hinges on three questions: (1)

whether the Consolidated District Court Actions constitute "prior proceedings" for purposes of res

judicata separate and distinct from Debtors' and Marina's adversary proceedings; (2) whether the

District Court issued a final judgment in the Consolidated District Court Actions; and (3) whether

the Consolidated District Court Actions and Debtors' and Marina's adversary proceedings involve

the same cause of action. Questions two and three directly correspond to elements one and four

of the above test.  Algonquin, of course, contends that all three questions must be answered affirmatively while Debtors and Marina contend otherwise.  The parties do not dispute that elements two and three of the above test are met here.

First, because Debtors and Marina raise the issue of whether the Consolidated District Court Actions are separate and distinct from Debtors' and Marina's adversary proceedings, the Court must address it.  The parties have not provided—and the Court is unaware of any—case law actually applying res judicata after a district court has rendered a judgment in a case where withdrawal of the reference has occurred as to some but not all causes of action originally brought within an adversary proceeding.  But courts routinely acknowledge, as Former Chief Judge Gerling did in these proceedings, that res judicata may apply in this scenario.  The only logical conclusion to be drawn from the present facts and circumstances, particularly where the Consolidated District Court Actions were pending prior to Debtors' bankruptcy filings and when Debtors and Marina commenced the adversary proceedings, is that the Consolidated District Court Actions are separate and independent federal actions from Debtors' and Marina's adversary proceedings, such that there can be no doubt that res judicata is applicable in the first instance.

Second, the Court must decide whether the District Court issued a final judgment in the Consolidated District Court Actions.  "'[A] judgment will ordinarily be considered final 'if it is not tentative, provisional, or contingent and represents the completion of all steps in the adjudication of the claim by the court . . . . One of the critical factors in determining whether a judicial determination is a final judgment for purposes of res judicata is whether it is also a final judgment for purposes of appeal.'" *Tibbetts*, 354 F. Supp. at 147 (quoting *Cadle Co. v. Drubner*, 303 F. Supp. 2d 143, 147 (D. Conn. 2004) (quoting *CFM v. Chowdhury*, 239 Conn. 375, 396 (1996))).

Here, the parties acknowledge that they have exhausted their appellate rights in the Consolidated District Court Actions.  The judgments entered in the Consolidated District Court Actions were not "tentative, provisional, or contingent," and represented the completion of all steps in the District Court's adjudication of the claims set forth therein.  *See Acha v. Beame*, 570 F.2d 57, 63 (2d Cir. 1978) ("'Finality will be lacking if an issue of law or fact essential to the adjudication of the claim has been reserved for future determination, or *if the court has decided that the plaintiff should have relief against the defendant on the claim but the amount of the damages, or the form or scope of other relief, remains to be determined.*'") (quoting Restatement (Second) of the Law of Judgments &41 cmt. b at 3 (Am. Law Inst., Tentative Draft No. 1, 1973)) (emphasis in original).  Debtors and Marina's argument that the District Court judgments should not be considered final because the amount of the Algonquin Claims has yet to be determined by this Court is therefore unavailing.  In making this argument, Debtors and Marina conflate the issues of damages on their tort claims and indebtedness on the B Note; Trafalgar's tort claims asserted in the Consolidated District Court Actions, although intended to obtain ownership of the B Note, are separate and independent from Algonquin's monetary claim under the B Note for purposes of res judicata.  Although Trafalgar and Marina could have pursued a unified resolution of all their claims in the District Court, Debtors and Marina chose a different course by filing their bankruptcy cases and commencing separate adversary proceedings.  They cannot now make an end run around the final judgments rendered in the Consolidated District Actions.  Algonquin has, therefore, satisfied the first element of res judicata.

Finally, the Court must determine the more difficult question of whether the instant adversary proceedings involve the same cause of action as the Consolidated District Court Actions.  "'Although definitions of what constitutes the same cause of action have not remained static over

time . . . the dominant federal rule is based on a transactional approach to defining the claim.'"

*Tibbetts*, 354 F. Supp. at 151  (quoting *F.D.I.C. v. Lenz*, 323 F. Supp. 2d 342, 347 (D. Conn. 2004)

(internal citation and quotation marks omitted)).   Drawing from Second Circuit precedent, the

court in *Tibbetts* continued to state: "'Whether or not the first judgment will have preclusive effect

depends in part on whether the same transaction or connected series of transactions is at issue,

whether the same evidence is needed to support both claims, and whether the facts essential to the

second were present in the first.'"   *Id.* at 149 (quoting *Expert Elec., Inc. v. Levine*, 554 F.2d 1227,

1234 (2d Cir. 1977)).   Also important to a finding of preclusive effect, "'is whether an independent

judgment in a separate proceeding would impair or destroy rights or interest established by the

judgment in the first action.'"   *Marvel Characters v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002)

(quoting *Sure-Snap Corp.*, 948 F.2d at 874).   As to the predominant question of whether the actions

arise from the same transaction or claim, "[i]t does not necessarily matter that a particular claim

was not brought in the prior proceeding because 'it is the facts surrounding the transaction or

occurrence which operate to constitute the cause of actions, not the legal theory upon which a

litigant relies.'"   *Id.* at 150–51 (quoting *Expert Elec., Inc.*, 554 F.2d at 1234).   The Court must

consider whether the claims at issue, namely Debtors' and Marina's equitable subordination and

fraudulent transfer claims, arise from the same "'nucleus of operative fact' [as their District Court

claims]–that is, 'whether the underlying facts are related in time, space, origin, or motivation,

whether they form a convenient trial unit, and whether their treatment as a unit conforms to the

parties' expectations.'"   *Fried v. LVI Servs.*, 557 Fed. Appx. 61, 64 (2d Cir. 2014) (quoting

*Waldman v. Vill. Of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000)).

   Algonquin argues that Claims 1, 4, and 6 are all more akin to breach of contract claims that

could have been timely asserted by Trafalgar and Marina in the First District Court Action and

therefore litigated and decided in the Consolidated District Court Actions.  Debtors and Marina contend that these core claims were slated for adjudication by this Court and, thus, the District Court did not consider any of the legal or factual issues attendant to such claims.

For the reasons that follow, the Court finds that Algonquin has satisfied the fourth and final element of res judicata and, thus, Debtors' and Marina's Claims 1, 4, and 6 are barred by res judicata.  Preliminarily, the Court notes that the extent of the prior litigation in the District Court was substantial and Debtors and Marina were forewarned by Former Chief Judge Gerling that future litigation may be barred since Trafalgar and Marina chose to pursue parallel proceedings in this Court while the Consolidated District Court Actions were pending.  The very same facts that were presented to the District Court are now before this Court.  Therefore, the Court agrees with Algonquin that Debtors and Marina now seek different remedies based on the same facts but under different legal theories.  Having received final adverse decisions in the Consolidated District Court Actions, Debtors and Marina now seek to contest matters under the auspices of bankruptcy that they have had a full and fair opportunity to litigate in the District Court in hopes that they will obtain a favorable decision from this Court to reduce or eliminate the Algonquin Claims, the latter of which is the same relief that they unsuccessfully attempted to obtain through the prior litigation. This continuous litigation and exhaustion of judicial resources is exactly what res judicata seeks to prevent.

The Court recognizes, as it must, the principle that whether both suits involve the same course of wrongful conduct is not decisive.  *Marvel Characters*, 310 F.3d at 287 (citing *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327–28 (1955)) ("[A] single course of conduct may give rise to more than a single cause of action for res judicata purposes.").  Res judicata is operable

where, however, the prior action could have resolved the questions raised and awarded the relief sought in the present action.

In the First District Court Action, Debtors and Marina included, *inter alia*, claims against Algonquin for conversion of the B Note and breach of fiduciary duty based upon Algonquin's alleged conversion of Trafalgar's assets, i.e., funds drawn at the direction of Algonquin in accordance with the Management Agreement from Trafalgar's operating account.  The District Court ultimately dismissed these nonmeritorious claims, 427 F. Supp. 2d. at 212, and the Second Circuit affirmed the same, 401 Fed. Appx. 584.  In the Adversary Complaint, Debtors and Marina generally allege that Algonquin has failed to "competently, prudently and faithfully manage and operate Debtors' various Power Projects" and to "properly and fully account for and pay over revenues due to Debtors."  Debtors and Marina also contend that Algonquin has converted the Power Projects to its own use and control.  (Adv. Compl. &5.)  Debtors' and Marina's equitable subordination and fraudulent transfer claims, although couched in bankruptcy terminology and based upon bankruptcy theories embodied in §§ 510(c), 544, 548, and 550, do not present any new facts to this Court that were not first presented to the District Court.  In other words, they "have their roots in the same soil" and are premised upon the same factual events.  *Kahre v. Damm*, No. 2:02-CV-00231, 2007 U.S. Dist. LEXIS 95978, at *47 (Nev. Dec. 18, 2007) ("The fact that res judicata depends on an 'identity of claims' does not mean that an imaginative attorney may avoid preclusion by attaching a different label to an issue that has, or could have, been litigated.") (internal citation and quotation marks).

Debtors and Marina argue that res judicata is inapplicable with respect to Claims 1, 4, and 6 because these types of claims are peculiar to bankruptcy law and, as such, they can only be decided in the bankruptcy setting.  This argument lacks merit and, accordingly, does not save their

Adversary Complaint.  *See Oberman v. Weiner (In re Crispo)*, No. 96 B 42570, 1997 Bankr. LEXIS 650, at *29 (Bankr. S.D.N.Y. May 13, 1997) ("Section 510(c) is not a means to evade application of res judicata where the claims upon which it is based have already been litigated in another court.") (citing *Shapiro v. Vanda Rest. Corp. (In re Litas Int'l, Inc.)*, No. 94 B 40093, 1996 WL 617776, at *3 (Bankr. S.D.N.Y. Sept. 6, 1996) (citing *GNK Enters., Inc. v. Conagra, Inc. (In re GNK Enters., Inc.)*, 197 B.R. 444 (Bankr. S.D.N.Y. 1996))).

Debtors and Marina alternatively argue that even if res judicata is applicable, the Court should exercise its discretion to ignore it.  The Court need not determine whether it may do so because it would decline this invitation even if it were an option.  The spirit and purpose of the Bankruptcy Code dictate that a bankruptcy case have a finite duration in which the debtor is permitted ample time to liquidate or reorganize.  Debtors have enjoyed bankruptcy status for nearly a decade and a half.  During this entire time, they have litigated through experienced and sophisticated counsel the issue of harm allegedly committed by Algonquin.  Equity therefore weighs against Debtors and Marina in favor of an expeditious resolution of and finality to Debtors' and Marina's adversary proceedings.

The Court finds that Algonquin has satisfied its burden of establishing the elements of res judicata.  Thus, Algonquin is entitled to summary judgment dismissing Debtors' and Marina's Claims 1, 4, and 6 and the Adversary Complaint in its entirety.  The Court having now found in favor of Algonquin on its first ground, the Court need not address the other grounds for relief asserted by Algonquin in support of it Motion for Summary Judgment.

## CONCLUSION

The Court issues this Memorandum-Decision and Order after an exhaustive analysis of the record and the parties' arguments.  Any arguments that have not been addressed herein have been

considered and rejected.    The Court will issue a separate judgment consistent with this Memorandum-Decision and Order.

Accordingly, it is

ORDERED that Debtors' Partial Summary Judgment Motion is DENIED; and it is further

ORDERED that Algonquin's Summary Judgment Motion is GRANTED; and it is further

ORDERED that the Adversary Complaint is dismissed on its merits.

IT IS SO ORDERED.

Dated: November 12, 2015
       Utica, New York

                                        /s/DIANE DAVIS_____
                                        DIANE DAVIS
                                        United States Bankruptcy Judge